*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MICHIGAN MUNICIPAL LEAGUE LIABILITY &
PROPERTY POOL,

FOR PUBLICATION
September 16, 2025
1:31 PM

Plaintiff-Appellant,

v

No. 371789
Oakland Circuit Court
LC No. 2023-200592-CZ

FARMERS INSURANCE EXCHANGE,

Defendant-Appellee.

Before: BORRELLO, P.J., and M. J. KELLY and TREBILCOCK, JJ.

PER CURIAM.

This no-fault insurance priority dispute concerns who is responsible for paying benefits to an uninsured person injured while boarding a municipally owned vehicle regularly used to provide transportation services to the public. Resolving this case requires examining MCL 500.3114(2)'s prioritization for vehicles "operated in the business of transporting passengers" and its related carveout for "a bus operating under a government sponsored transportation program." MCL 500.3114(2)(c). For the reasons that follow, we conclude subsection (2)(c) applies in this instance and affirm the trial court's grant of summary disposition in defendant's favor.

## I. BACKGROUND

Located in southwest Michigan, the City of Niles has about 12,000 residents. At issue is its Dial-A-Ride Transportation (DART) program, which transports individuals without reliable transportation to certain shopping and recreational areas, medical facilities, and residences. City employees drive the DART vehicles, which the City owns and insures. Just over 8,000 passengers (of the nearly 30,000 in the service area) take advantage of DART's services.

This dispute stems from Onlee Clemans injuring herself while boarding one of the City's DART vehicles. Because she does not have applicable insurance offering personal protection insurance (PIP) benefits under the no-fault act, MCL 500.3101 *et seq.*, she sought coverage from the City's insurer, plaintiff Michigan Municipal League Liability & Property Pool (the Pool). After paying Clemans some benefits, the Pool then advised her to seek them instead through the Michigan Assigned Claims Plan (MACP), which provides PIP benefits to persons injured in an

auto accident who otherwise do not have applicable insurance coverage. MCL 500.3172(1). MACP ultimately denied responsibility, resulting in this lawsuit.

The Pool requested declaratory relief concluding MACP, not the Pool, must pay Clemans's claims under MCL 500.3114. MACP then assigned the claim to defendant Farmers Insurance Exchange, and the Pool filed an amended complaint substituting Farmers for MACP. The Pool eventually sought summary disposition under MCR 2.116(C)(10), and Farmers requested summary disposition under MCR 2.116(I)(2) in response. The trial court ruled in Farmers's favor in an oral ruling from the bench. The Pool appeals by right, and we review the trial court's grant of summary disposition under MCR 2.116(I)(2) de novo. *Trostel, Ltd v Dep't of Treasury*, 269 Mich App 433, 439; 713 NW2d 279 (2006).

## II. ANALYSIS

### A. NO-FAULT PRIORITY UNDER MCL 500.3114

Under the no-fault act, an injured person's insurer generally provides PIP benefits. MCL 500.3114(1). Subsection (4) of the statute delivers coverage, in certain circumstances, to those without an insurance policy available to them. In relevant part, it dictates that, "[e]xcept as provided in subsection[] (2) . . . , a person who suffers accidental bodily injury arising from a motor vehicle accident while an occupant of a motor vehicle who is not covered under a personal insurance policy as provided in subsection (1)" shall claim PIP benefits through the MACP instead. MCL 500.3114(4); see also MCL 500.3171 to MCL 500.3175. Notably, subsections (1) and (4) do not apply if subsection (2)—the exception at issue in this litigation—does. MCL 500.3114(1) and (4).

The first clause of subsection (2) states that "[a] person who suffers accidental bodily injury while an operator or a passenger of a motor vehicle operated in the business of transporting passengers shall receive the [PIP] benefits to which the person is entitled from the insurer of the motor vehicle," MCL 500.3114(2), and it is through this provision that the Pool, as the City of Niles's insurer, initially paid benefits. But its second clause carves out eight exemptions from subsection (2):

> This subsection does not apply to a passenger in any of the following, unless the passenger is not entitled to [PIP] benefits under any other policy:
>
>> (a) A school bus, as defined by the department of education, providing transportation not prohibited by law.
>>
>> (b) A bus operated by a common carrier of passengers certified by the department of transportation.
>>
>> (c) A bus operating under a government sponsored transportation program.
>>
>> (d) A bus operated by or providing service to a nonprofit organization.

(e) A taxicab insured as prescribed in [MCL 500.3101] or [MCL 500.3102].

(f) A bus operated by a canoe or other watercraft, bicycle, or horse livery used only to transport passengers to or from a destination point.

(g) A transportation network company vehicle.

(h) A motor vehicle insured under a policy for which the person named in the policy has elected to not maintain coverage for personal protection insurance benefits under [MCL 500.3107d] or as to which an exclusion under [MCL 500.3109a(2)] applies.

Critical to this case is subsection 2(c), the carveout for "[a] bus operating under a government sponsored transportation program." MCL 500.3114(2)(c).

## B. SUBSECTION 2(C) APPLIES

The parties dispute whether the DART vehicle that Clemans injured herself while boarding constitutes "a motor vehicle operated in the business of transporting passengers" under MCL 500.3114(2). Relying on some of this Court's caselaw interpreting that phrase in the commercial-services context (a distinction with a difference as explained below), the Pool asserts DART's transportation services are merely incidental to the City's broader governmental purpose and thus subsection (2)'s prioritization of the Pool (as the City's insurer) does not apply, shifting priority back to the MACP under subsection (4). Farmers sees it differently and asks us to apply the straightforward language of subsection (2)(c)'s "bus" carveout to help inform what it means to be "in the business of transporting passengers." We agree with Farmers.

Begin with what the no-fault act does not do. It does not define "a motor vehicle operated in the business of transporting passengers," and this Court has concluded that phrase "does not have a clear and unambiguous meaning." *Farmers Insurance Exchange v AAA of Michigan*, 256 Mich App 691, 697; 671 NW 2d 89 (2003). But this Court has given it some meaning in the context of a nonpublic entity's provision of transportation services. See *id.*; see also *Smith v Farm Bureau Mut Ins Co of Mich*, ___ Mich App ___; ___ NW3d ___ (2025) (Docket No. 369139). First, *Farmers* concluded subsection (2)'s applicability turns "on a primary purpose/incidental nature inquiry with respect to whether a motor vehicle is operated in the business of transporting passengers." 256 Mich App at 697. And, more recently, *Smith* distilled *Farmers* as having two components: "(1) whether the transportation of passengers is the primary purpose for which the vehicle is used and (2) whether the transportation of passengers is a primary, as opposed to incidental, component of the overall business or activity of the operator. If answered affirmatively, a motor vehicle is 'in the business of transporting passengers.' " *Smith*, ___ Mich App at ___; slip op at 7 (citation omitted).

To illustrate application of this test, we begin with *Farmers*. That matter concerned a day-care provider who drove children to school. *Farmers*, 256 Mich App at 693. This Court concluded that was merely an incidental use and thus did not fall within subsection (2). *Id*. at 701-702. Several facts drove that holding, including: (1) "her driving of the children to school in her vehicle

-3-

occurred incidentally to the vehicle's primary use as a personal vehicle," and (2) "her transportation of the children to and from school constituted an incidental or small part of her day-care business." *Id*.

*Smith* too involved a commercial application. The vehicle at issue there was a car dealership's shuttle that transported passengers to and from the dealership. *Smith*, ___ Mich App at ___; slip op at 2. Regarding the previously described first prong, the *Smith* Court easily concluded that the primary purpose—indeed, the "near-exclusive purpose"—of the dealership's shuttle was "the transportation of passengers to and from the dealership." *Id*. at __; slip op at 7. *Smith* struggled, however, with analyzing the second prong, concluding that a genuine dispute of fact existed concerning whether transporting passengers was a primary component of the dealership's business. *Id*. On the one hand, the Court noted that "the dealership's primary business [was] to sell new and used cars, and service and repair cars," and it offered the shuttle service as a "courtesy" (of which maybe 10-15% of customers utilized) that "did not generate any revenue for the dealership." *Id*. But other facts cut against finding it was an incidental use: "over 20 Google reviews mention[ed] the dealership's shuttle van service, indicating the service [was] regularly offered and regularly provided"; the injured passenger had used the service "more than once"; and "the dealership even kept the shuttle van service running during the height of the COVID-19 pandemic, evidencing it was considered essential to the dealership's basic function." *Id*.[1]

Crucially, however, neither *Farmers* nor *Smith* had the occasion to consider this judicially created test in relation to subsection (2)(c)'s carveout for "a bus operating under a government sponsored transportation program" and thus do not control. Reading the no-fault act as a whole, and subsection (2) of MCL 500.3114 specifically, the distinction between commercial enterprises and government-operated systems is paramount. Courts interpret a statute not "in isolation" but rather with a view towards "constru[ing] its meaning in light of the context of its use." *South Dearborn Environmental Improvement Ass'n v Dep't of Environmental Quality*, 502 Mich 349, 367-368; 917 NW2d 603 (2018). And here, the bus carveout—as the trial court astutely observed—provides the context that gives full meaning to the "a motor vehicle operated in the business of transporting passengers" phrase when a government entity's bus transportation program is at issue.[2] See *Smith*, ___ Mich App at ___; slip op at 3 (YOUNG, J., concurring) ("[B]ecause the Legislature listed numerous exceptions to MCL 500.3114(2) that may not be for-profit endeavors (e.g. governmental and non-profit vehicles (§ 3114(2)(a)-(d)) and situations where the 'business of transporting passengers' is not an organization's primary purpose (e.g. a

---

[1] Numerous other unpublished opinions of this Court provide further examples of this test's application, with most addressing a private company's transportation of clients. See, e.g., *Sandoval v Farmers Ins Exch*, unpublished per curiam opinion of the Court of Appeals, issued May 9, 2025 (Docket No. 361166) (finding a dispute of fact concerning whether Henry Ford Health System's shuttle-bus service transporting patients and employees between its buildings and parking lots was more than an incidental component of its operation of a healthcare system).

[2] Because our focus here is exclusively on subsection 2(c)'s application, we do not address any other carveouts as they relate to defining "a motor vehicle operated in the business of transporting passengers."

canoe livery, § 3114(2)(f), it is evident the Legislature did not intend either to be necessary for § 3114(2) to apply.").

In so reasoning, we acknowledge that our analytical path parts ways with at least two other unpublished decisions from this Court, *MIC Gen Ins Corp v. Mich Muni Risk Mgt Auth*, unpublished per curiam opinion of the Court of Appeals, issued October 18, 2018 (Docket No. 341766), and *Ahee v Novi*, unpublished per curiam opinion of the Court of Appeals, issued March 19, 2019 (Docket No. 341072). Both matters involved what we have here—a municipal vehicle that engaged in regular transportation of citizens. See *MIC*, unpub op at 1 (the Mecosta County Commission on Aging's (MCCOA) medical transportation of senior citizen residents); *Ahee*, unpub op at 2 (City of Novi's Older Adult Services Transportation Program). Yet, those cases did not turn on using the carveout to inform the exception's application; instead, they required detailed analyses concerning whether transporting seniors was the "primary purpose" of the governmental entity.

Consider *MIC* first. The MCCOA used the vehicle at issue there exclusively to "transport elderly residents and not for any other purpose." See *MIC*, unpub op at 5. This Court then considered whether that operation fell within the MCCOA's "primary purpose," and concluded that it did. *Id.* at 5-6. Chief to that determination was the agency's charge—"to improve the quality of life of the county's 60-plus population [and] to support seniors in their efforts to remain in their own homes, maintaining independence, health, dignity, and self-respect." *Id.* at 5 (quotation marks omitted). The *MIC* Court also noted that transportation represented over ten percent of the agency's expenditures. *Id.* at 6. Only after concluding the primary-purpose test applied did the *MIC* Court turn to subsection (2)(c)'s bus carveout, holding that the agency's operation was a "government sponsored transportation program" but that the carveout did not apply because the vehicle at issue was not a "bus" as defined by MCL 500.3114(2)(c). *Id.* at 6-12.

*Ahee*, by contrast, involved a vehicle owned and operated not by a smaller subdivision, but, like here, by a city itself—the City of Novi. *Ahee*, unpub op at 2. In finding the city's vehicle was merely incidental to Novi's larger purpose, the *Ahee* Court accepted the argument that the city's provision of transportation services "was but a small program run by a single department of the City's large organizational structure." *Id*. at 6. It noted that "the City's operations did not solely cater to the elderly or disabled residents . . . , nor were the . . . services necessary to the City's operations," *id.*, and that the program "serve[d] only a fraction of the City's residents and account[ed] for an insignificant portion of the City's activities," *id*. at 6-7. Finally, *Ahee* distinguished *MIC* based solely on the City of Novi, not its subdivision, being "the title owner of the van and the specific entity insured by [the applicable] policy." *Id*. at 7 n 5.

In our view, discerning the general purpose of a municipality, focusing on percent of expenditures allocated and who owned, operated, and insured the vehicle, and then deciding whether that was enough to draw a line between primary and incidental shows how applying the primary purpose test to the bus carveout "abandon[s] the canons of common sense." *Marquis v Hartford Acc & Indem*, 444 Mich 638, 644; 513 NW2d 799 (1994). See also *Ahee* (GLEICHER, J., concurring), unpub op at 4 ("[T]he test is not really objective and does not yield predictable results. Here, it seems obvious that the city is 'in the business of transporting passengers.' "). Indeed, the Pool asserted at argument that no city-owned bus offering transportation services to citizens would satisfy the primary-purpose test, which if we agreed, would write out the "bus" carveout altogether.

-5-

See *2 Crooked Creek, LLC v Cass County Treasurer*, 507 Mich 1, 9; 967 NW2d 577 (2021) ("[C]ourts must . . . avoid an interpretation that renders nugatory or surplusage any part of a statute.") (quotation marks and citation omitted). Such a result is inconsistent with and cuts against the obvious intent of the statute. *Barrow v City of Detroit Election Comm*, 301 Mich App 404, 416; 836 NW2d 498 (2013) ("Under the absurd-results rule, 'a statute should be construed to avoid absurd results that are manifestly inconsistent with legislative intent . . . .' ") (citation omitted; omission in original).

Here, we cannot imagine a more straightforward application of subsection (2)(c). First, all parties agree that DART is plainly a "government sponsored transportation program." See also *MIC*, unpub op at 6-9. Second, the trial court found that the vehicle at issue was a "bus" as contemplated by subsection (2)(c), and the Pool conceded at argument that it did not challenge that assertion below.[3] Third, the parties agree that Clemans was "not entitled to personal insurance benefits under any other policy" (and that MACP does not constitute "any other policy" for purposes of subsection (2)(c)). Under these facts and applying the plain language of the statute, the Pool is first in priority for providing Clemans with PIP benefits.

## III. CONCLUSION

For these reasons, we affirm the trial court's judgment.

/s/ Stephen L. Borrello
/s/ Michael J. Kelly
/s/ Christopher M. Trebilcock

---

[3] For completeness's sake, we note that, in a footnote in its brief on appeal, the Pool claims that "it is hardly clear that the subject vehicle even constitutes a 'bus' for purposes of MCL 500.3114(2)(c)." But it did not set this forth in its statement of issues (which instead focuses exclusively on the primary purpose/incidental nature test), rendering the issue abandoned, concession notwithstanding. See *Ypsilanti Fire Marshall v Kircher*, 273 Mich App 496, 543; 730 NW2d 481 (2007). To be sure, the *MIC* Court would likely disagree with the trial court's "bus" finding because the vehicle at issue there (a Ford E-350) is apparently similar in all respects to the Ford Econoline van used by the City of Niles here. See *MIC*, unpub op at 9-12; but see *Ahee* (GLEICHER, J., concurring), unpub op at 4-7 (disagreeing with *MIC*'s analysis). But we take cases based on how the parties frame the issues, and we thus do not address whether the trial court erred in concluding the vehicle at issue was a "bus" for purposes of subsection (2)(c).